UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ATHENA FEMININE TECHNOLOGIES INC., <br><br> Plaintiff, <br><br> vs. <br><br> DEREK WILKES, PELFIT TECHNOLOGIES LLC, MORTON CORDELL, SILK ROAD ASSOCIATES, LLC, SIMON FAN, and KING CHAMPION (HONG KONG) LTD., <br><br> Defendants. | Case No: C 10-04868 SBA <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART DEFENDANTS MORTON CORDELL AND SILK ROAD ASSOCIATES LLC'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS** <br><br> Docket 41, 43 |

Plaintiff Athena Feminine Technologies Inc. ("Athena") brings the instant action for patent infringement against Defendant Pelfit Technologies ("Pelfit LLC") and inducing patent infringement against Defendants Derek Wilkes ("Wilkes"), Morton Cordell ("Cordell") and Silk Road Associates LLC ("Silk Road"). In addition, Athena alleges several supplemental state law claims against these and other Defendants.

The parties are presently before the Court on (1) Defendants Wilkes, Pelfit LLC, Cordell and Silk Road's Motion to Dismiss Plaintiff's First Amended Complaint, or, in the Alternative, for Summary Judgment; and (2) Defendants Cordell and Silk Road's Motion to Compel Arbitration and Stay Proceedings. Docket 41, 43. Having read and considered the papers submitted and the record in this action, and being fully informed, the Court hereby

GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss, and GRANTS the motion to compel arbitration. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court adjudicates the instant motion without oral argument.

## I. BACKGROUND

### A. Factual Summary

#### 1. Development of the PMT by Athena

Plaintiff Athena is the developer and owner of the Pelvic Muscle Trainer ("PMT"), a wireless electrical stimulation product developed to treat and prevent female incontinence. FAC ¶ 2. The technology utilized in the PMT is covered by United States Patent No. 7,577,476 ("'476 patent"). First Am. Compl. ("FAC") ¶ 3.

In or about April 2004, Wilkes began providing consultation and engineering services to Athena to facilitate the manufacture of the PMT by King Champion, a Hong Kong-based entity. Id. ¶ 17. In connection with the same, on April 17, 2004, Athena and Wilkes executed a Confidentiality Agreement, which provided, inter alia, that the confidential information provided to Wilkes "and any derivatives thereof, whether created by the Company or Recipient," were to remain the property of Athena. Id. ¶¶ 13-14.

On April 20, 2004, Athena began production of the PMT at a manufacturing plant operated by King Champion. Id. ¶ 18. Like Wilkes, King Champion, entered into to a Confidentiality Agreement with Athena. Id. Ex. C. The agreement was signed by Simon Fan ("Fan"), as Director of King Champion. Id.

Beginning on or about June 21, 2006, Athena began selling its PMT to distributors in the United Kingdom and elsewhere through Silk Road, a limited liability company owned and operated by Morton Cordell ("Cordell"). Id. ¶ 20. Cordell served as a Marketing Consultant for Athena and signed the same Confidentiality Agreement as Wilkes and King Champion. Id. ¶ 7. The parties memorialized their business relationship in a Marketing and Distribution Agreement ("Distribution Agreement"), which was signed on July 20, 2006, and deemed effective as of July 17, 2006. Cordell Decl. Ex. B, Dkt. 20-2.

The final paragraph of the Distribution Agreement states that: "All disputes will be submitted to binding arbitration." Id.

### 2. Development of the PEX by Wilkes

In late 2007, Wilkes began designing and producing a product known as the Personal Exerciser ("PEX"), which Athena avers is a "derivative product of Athena's PMT." Id. ¶ 21. Wilkes allegedly used drawings and specifications obtained under his Confidentiality Agreement to create the PEX. Id. Wilkes had King Champion manufacture and produce a prototype of the PEX. Id. ¶ 23.

Athena claims it was unaware of Wilkes' development of the PEX until "early 2008." Id. Thus, on October 25, 2008, Athena sent Wilkes a cease and desist letter. Id. ¶ 24 and Ex. E. In its letter, Athena claimed that "the PEX is a copy of the next generation version of the Athena PMT," and therefore, he had no ownership, marketing or distribution rights with respect to the PEX. Athena further stated:

> Derek, you cannot sell what you do not own. *You do not own the PEX*, you have no rights, unless specifically authorized by Athena, to sell modify, or manufacture any products that has any similarity or functionality related to any of Athena's products. Any products, product ideas, improvements to Athena's products or manufacturing processes belong to Athena. As a consultant to Athena, you became familiar with the Athena product, and thus have no right to take our technology, products and manufacturing process and call it your own.

Id. (emphasis added).

In response to Athena's accusations, Wilkes allegedly caused Fan and King Champion to threaten to cease manufacturing Athena's product. Id. ¶ 25. Athena claims that without an alternate manufacturer in place, it would "have been out of business." Id. "In order to prevent this and to avoid litigation with Wilkes and King Champion," Athena entered into discussions with Wilkes, Cordell and Fan whereby "Defendants would acknowledge that the PEX was derivative of the PMT and was the product of, and owned by Athena, that the PEX would be marketed by Athena globally and that Defendant Wilkes would receive stipulated royalties on the sales of the PEX…." Id.

On November 14, 2008, Athena entered into an agreement with Cordell and Wilkes regarding the PEX and related matters.  Id. ¶ 26 & Ex. F.  The agreement did *not* reflect that Athena, in fact, owned the rights to the PEX, however.  Instead, the agreement stated:

> 5. …. Derek [Wilkes] … will be listed as the inventor of record of the next generation PMT product known as the "PEX."  The PEX will be Athena's product, but Athena agrees to pay Derek a royalty for the sale of each PEX….
>
> ….
>
> If Athena Feminine Technologies, Inc., ceases operations, or chooses to no longer market the PEX, then marketing rights for the PEX will revert back to Derek.

Id. Ex. F ¶ 5.  Despite the plain language of the agreement, Athena now avers that "[b]y entering into the November 14, 2008 Agreement, Athena did not intend to, nor did it in fact, settle, release or waive any claims against defendants Wilkes, Cordell or any other person…."  Id. ¶ 27.  After entering into the above agreement, Athena requested that King Champion manufacture a PEX product under the "Spirit" name for sale in the United Kingdom market.  Id. ¶ 28.

Sometime in 2010, Wilkes and his wife, with assistance from Fan and King Champion, founded Pelfit Technologies LLC ("Pelfit LLC") for the purpose of producing the PEX under the name "Pel*Fit" (also referred to as the "Pelfit").  Id. ¶ 32.[1]  Cordell joined Pelfit LLC as an officer and began to contact Athena's customers, without Athena's knowledge or consent.  Id. ¶ 33.  Pelfit LLC is now actively involved in the marketing and sale of the PEX in Europe, South America and Asia, and has announced its intention to sell the product in the United States.  Id. ¶ 35.  On July 15, 2010, Wilkes provided notice to Athena "that the PEX marketing rights licensed to Athena in the letter agreement dated November 14, 2008 … have been terminated effective July 15, 2010."  Id. Ex. H, Dkt. 35-8.

---

[1] The parties refer to the Pel*Fit, Pelfit and PEX interchangeably.

### B. Procedural History

On October 27, 2010, Athena filed the instant action in this Court. On January 27, 2011, Athena filed a First Amended Complaint against the following parties: Wilkes; Pelfit LLC; Cordell; Silk Road; Fan; and King Champion. Dkt. 34. The amended complaint alleges seven claims for relief, as follows: (1) direct patent infringement (against Pelfit LLC); (2) inducing patent infringement (against Wilkes, Fan and Cordell); (3) misappropriation of trade secrets (against all Defendants); (4) breach of contract (against Wilkes, Silk Road and King Champion; (5) inducing breach of contract (against Wilkes and Cordell); (6) intentional interference with business relations and economic advantage (against Wilkes and Cordell); (7) unfair competition (against all Defendants); and (8) declaratory relief (against all Defendants).

In response to the amended complaint, Defendants Wilkes, Pelfit LLC, Cordell and Silk Road have filed a Motion to Dismiss Plaintiff's First Amended Complaint, or, in the Alternative, for Summary Judgment. Dkt. 43. The moving Defendants contend that the Court lacks subject matter jurisdiction over Athena's patent claims. In particular, they argue that because the Food and Drug Administration ("FDA") has not approved the PEX for sale in the United States, Pelfit LLC could not have infringed upon the '476 patent, as a matter of law.[2] As to Athena's remaining state law claims, the moving Defendants contend that such claims are barred by the August 14, 2008 Agreement, and are otherwise insufficiently pled. Separately, Cordell and Silk Road move to compel arbitration of the claims alleged against them specifically, pursuant to the arbitration clause contained in the Distribution Agreement between Athena and Silk Road. Both motions have been fully briefed and are ripe for adjudication.

---

[2] Though Defendants purport to challenge Athena's patent claims based on lack of subject matter jurisdiction under Rule 12(b)(1), their arguments are more appropriately analyzed under Rule 12(b)(6). District court have exclusive, original jurisdiction over patent claims. See 28 U.S.C. § 1338. Therefore, subject matter jurisdiction over Athena's patent claims is present. Defendants' argument that Pelfit LLC could not have violated the Patent Act on the ground that the PEX has not been approved for sale by the FDA in the United States is germane to whether Athena has stated a plausible claim, not whether the Court has subject matter jurisdiction.

## II. MOTION TO DISMISS

### A. LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). In deciding a Rule 12(b)(6) motion, the court must generally "consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). The allegations must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted). Where a complaint or claim is dismissed, leave to amend generally is granted, unless further amendment would be futile. Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1087-88 (9th Cir. 2002).

### B. CLAIMS

#### 1. Direct Patent Infringement

Section 271(a) of the United States Patent Act ("Patent Act") states that "whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States *or imports into the United States* any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (emphasis added). In its amended complaint, Athena alleges that "Defendant Pelfit has infringed and is still infringing Plaintiff's Letters Patent by importing, using and stating its intention to sell 'The Pel*Fit' product into the United States, and will continue to do so unless enjoined by this court." FAC ¶ 47.[3]

---

[3] Pelfit LLC has acknowledged importing the PEX into the United States. Wilkes Decl. ¶ 6, Dkt. 44.

- 6 -

Defendants contend that Pelfit LLC has not received FDA authorization to sell the PEX in the United States, and therefore, it could not have sold any products infringing upon the patent-in-suit. Athena does not dispute that FDA approval is required for Pelfit LLC to sell its product in the United States, but contends that its importation of the PEX, standing alone, is sufficient to trigger a violation of the Patent Act. The Court agrees. Under the plain terms of § 271(a), the act of importation, standing alone, is sufficient to state a claim for direct infringement. See Fellowes, Inc. v. Michilin Prosperity Co., Ltd., 491 F. Supp. 2d 571, 583 (E.D. Va. 2007) ("to directly infringe under § 271(a), an importation of an infringing product need not include, nor be followed by, a sale, offer to sell, or any other particular course of action; *the infringing activity is the unauthorized importation of an infringing product itself.*") (emphasis added). Tellingly, Defendants completely fail to respond to Athena's argument in their reply.

Next, Defendants contend that they are shielded from liability for patent infringement under the experimental use defense. This affirmative defense is a "very narrow" and "strictly limited" exception to patent infringement applicable only where the infringing use is "for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry." Madey v. Duke Univ., 307 F.3d 1351, 1361-62 (Fed. Cir. 2002) (quoting Embrex, Inc. v. Serv. Eng'g Corp., 216 F.3d 1343, 1349 (Fed. Cir. 2000)) (internal quotations omitted). The defense is inapt where the use has the "slightest commercial implication." Id. at 1362 (citation omitted). Since experimental use is an affirmative defense, Defendants bear the burden of establishing the defense. Id. at 1361.

In support of their experimental use defense, Defendants proffer the declaration of Wilkes, the sole managing member of Pelfit LLC, who claims that: "[PEX] units have been used for very limited purposes, *primarily* for experimental testing to ensure that they work properly or for the use outside of the United States by individuals such as myself or Mr. Cordell who reside in the US but frequently travel abroad on business for Pelfit." Wilkes Decl. ¶ 6 (emphasis added). However, while Mr. Wilkes states that he imported PEX devices "primarily" for testing purposes, he does not state that this was the *only*

**1**  purpose for doing so.  Nor does Mr. Wilkes confirm that there was no "commercial
**2**  implication" involved in the importation of the PEX.  As such, the Court cannot resolve the
**3**  experimental defense, as a matter of law, based on the record presented.
**4**        Finally, Defendants argue that Athena's patent infringement claim is insufficiently
**5**  pled under Twombly and Iqbal.  To state a claim for direct patent infringement, only the
**6**  following is required:  (1) an allegation of jurisdiction; (2) a statement that plaintiff owns
**7**  the patent; (3) a statement of the infringing activity; (4) a statement that the plaintiff has
**8**  given the defendant notice of its infringement; and (5) a demand for an injunction and
**9**  damages.  See McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1357 (Fed. Cir. 2007).
**10**  Under Twombly, "a patentee need only plead facts sufficient to place the alleged infringer
**11**  on notice as to what he must defend."  Id.
**12**        Defendants take issue with the sufficiency of Athena's allegations regarding Pelfit
**13**  LLC's allegedly infringing activities.  The pleadings allege that "Pelfit has infringed and is
**14**  still infringing Plaintiff's Letters Patent by importing, using and stating its intention to sell
**15**  'The [PEX]' product into the United States[.]"  FAC ¶ 47.  Among other things, the
**16**  amended complaint points to Pelfit's website, and avers that Pelfit's importation is
**17**  connected to its stated intention of marketing the PEX in the United States.  Defendants
**18**  assert that the allegations of the amended complaint are contradicted by Exhibit G to the
**19**  pleadings, which is a print-out from Pelfit LLC's website.  Though not entirely clear,
**20**  Defendants appear to suggest that the pleadings claim that the sale of the PEX is now
**21**  occurring in the United States, while the webpage indicates that the product is "Coming
**22**  Soon" to the United States.  FAC Ex. G, Dkt. 35-7 at 4.  This contention lacks merit.
**23**  Despite Defendants' assertions to the contrary, the pleadings do not allege that Pelfit LLC
**24**  is currently selling its product.  Rather, the Amended Complaint expressly alleges that
**25**  Pelfit LLC imported infringing devices into the United States, and that the
**26**  commercialization of those products is "imminent."  FAC ¶ 49.  Such allegations are
**27**  sufficient to place Pelfit "on notice as to what it must defend."  McZeal, 501 F.3d at 1357.
**28**

Defendants' motion to dismiss Athena's first claim for direct patent infringement against Pelfit LLC is therefore DENIED.

### 2. Inducing Patent Infringement

Defendants also move to dismiss Athena's second claim for inducing patent infringement, claiming that such claim cannot exist absent a viable a claim for direct infringement. Mot. at 7. Since Athena has stated a plausible claim for direct infringement, Defendants' motion to dismiss Athena's second claim for inducing infringement is likewise DENIED.

### 3. Misappropriation of Trade Secrets

Athena's third claim is for misappropriation of trade secrets under the UTSA. "Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.'" CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc., 160 Cal.App.4th 288, 297 (2008) (quoting in part Sargent Fletcher, Inc. v. Able Corp., 110 Cal.App.4th 1658, 1665 (2003)). The UTSA defines "'trade secret' as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

#### a) Ownership of the PEX

The FAC alleges that Defendants misappropriated "PMT engineering and design drawings and specifications provided to Wilkes and King Champion," to develop "a derivative product, namely the PEX or 'Pelfit.'" FAC ¶ 61. Defendants seek dismissal of this claim on the basis that, under the terms of the parties' November 14, 2008 Agreement, Wilkes—not Athena—now owns the rights to the PEX. To analyze Defendants' argument, the Court must first determine whether Defendants' construction of that agreement is

correct. Under California law, contracts are to be interpreted to give effect to the mutual intention of the parties at the time of contracting. Cal. Civ. Code § 1638; Waller v. Truck Ins. Exch., 11 Cal.4th 1, 18 (1995). "[S]uch intent is to be inferred, if possible, solely from the written provisions of the contract," read in their ordinary and popular sense, unless it appears the parties used the terms in some special sense. AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 822 (1995) (citing Cal. Civ. Code § 1639). "[T]he meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." Zalkind v. Ceradyne, Inc., 194 Cal.App.4th 1010, 1027 (2011). "If the contract language is clear and explicit, it governs." Foster-Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal.4th 857, 868 (1998) (internal quotations and citation omitted).

Applying the foregoing rules of contract interpretation, the Court is not persuaded by Defendants' interpretation of the November 14, 2008 Agreement. Despite Defendants' assertions to the contrary, the agreement does *not* state that Wilkes is the owner of the PEX. Rather, it merely identifies Wilkes as the "*inventor*" of the PEX. Notably, the term "inventor" is not defined nor is its meaning readily apparent from the agreement. Nor is there any provision therein evidencing the parties' mutual intent to establish Wilkes as the owner of all rights to the PEX. To the contrary, the agreement expressly provides that, "The PEX will be *Athena's* product." Id. The Court is not at liberty to credit the provisions of the agreement that favor Defendants, while ignoring those which do not. See Sunset Sec. Co. v. Coward-McCann, Inc., 47 Cal. 2d 907, 911 (1957) ("It is beyond question that *every provision of a contract* should be examined to determine the meaning and intention of the parties.") (emphasis added). Moreover, on a motion to dismiss, the Court must accept the factual allegations of the pleadings as true, and construe them in a light most favorable to the non-movant. See Outdoor Media Group, 506 F.3d at 899-900. Under this standard, the Court finds that Athena has alleged sufficient facts to establish a plausible claim of ownership of the PEX to sustain a claim for misappropriate of trade secrets under the UTSA.

### b) Liability of Cordell and Silk Road

Alternatively, Defendants contend that Plaintiff's misappropriation of trade secrets claim should be dismissed as to Cordell and Silk Road on the grounds the allegations against them are too conclusory under Twombly and Iqbal. Defs.' Mot. at 9-10. The FAC alleges that Cordell and Silk Road conspired with Wilkes to misappropriate Athena's confidential information. FAC ¶ 64. To impose liability based on a civil conspiracy, the plaintiff must show "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." Kidron v. Movie Acquisition Corp., 40 Cal.App.4th 1571, 1581 (1995) (citing Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 510-511 (1994)).

Athena contends that it has alleged sufficient facts to establish Cordell and Silk Road's liability as co-conspirators based on their having executed Confidentiality Agreements and subsequently participating in the discussion with Athena leading to the November 14, 2008 Agreement. Pl.'s Opp'n at 17-18. The Court disagrees. The conclusory allegations of the FAC fail to show that Cordell and Wilkes formed a conspiracy or that they engaged in wrongful conduct in furtherance of such conspiracy to the detriment of Athena. Thus, as to these Defendants, Athena's misappropriation of trade secrets claim must fail. Athena will be granted leave to amend to cure these deficiencies.

In sum, the Court GRANTS Defendants' motion to dismiss Athena's third claim for misappropriation of trade secrets as to Cordell and Silk Road, with leave to amend. As to the other Defendants, the motion to dismiss is DENIED.

### 4. Breach of Contract

Athena's fourth claim for breach of contract alleges that Defendants Wilkes, Silk Road and King Champion breached their respective Confidentiality Agreements by using confidential information to develop the PEX. FAC ¶¶ 68-71. To state a claim for breach of contract under California law, Plaintiff must plead facts establishing the following elements: "(1) existence of the contract; (2) plaintiff's performance or excuse for

nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." CDF Firefighters v. Maldonado, 158 Cal.App.4th 1226, 1239 (2008).

Defendants contend that Athena has failed to allege facts sufficient to show that it suffered damages as a result of their alleged conduct because "no Pelfit product has been sold or offered for sale by Defendants in the United States." Defs.' Opp'n at 11. This contention lacks merit. Athena alleges that Defendants breached their respective Confidentiality Agreements by using confidential information obtained pursuant to those agreements in order to formulate the PEX, and by refusing to return confidential information to Athena. FAC ¶ 69. In each of the Confidentiality Agreements at issue, the parties expressly agreed that a breach of any its provisions or promises "will result in irreparable and continuing damage to the other party for which there will be no adequate remedy at law . . . ." Cordell Decl. Ex. A ¶ 14. Given this acknowledgment, whether or not Defendants sold or offer to sell the PEX or any "Pelfit product" in the United States is inapposite to whether Athena has adequately alleged that it suffered damages as a result of Defendants' alleged breach of contract. Accordingly, the Court DENIES Defendants' motion to dismiss Athena's fourth cause of action.

### 5. Inducing Breach of Contract

To state a claim for intentional interference with contractual relations, a plaintiff must show: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Pac. Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1126 (1990).

Here, Athena alleges that Wilkes and Cordell intentionally "induced and caused" King Champion to breach its Confidentiality Agreement by using Athena's confidential information "for the purpose of production of the PEX or Pelfit at their request." FAC ¶ 74. However, Athena fails to allege facts demonstrating that Wilkes or Cordell knew that King Champion had entered into a Confidentiality Agreement with Athena. Nor does

Athena allege any particular facts showing that either individual engaged in intentional acts intended to induce King Champion's breach of such agreement. Because Athena's conclusory allegations fail to comport with the requirements of Twombly and Iqbal, the Court GRANTS Defendants' motion to dismiss Athena's fifth claim, with leave to amend.

### 6. Intentional Interference with Business Relations

In its sixth claim for relief, Athena alleges that Wilkes wrongfully informed King Champion that "he is the owner of the PEX," and that he and Cordell did so intentionally in order to disrupt "relations between Plaintiff and its manufacturer, King Champion, and its distributors . . . ." FAC ¶ 79. To state a claim for tortious interference with business relations, a plaintiff must establish five elements:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc., 913 F.2d 676, 689 (9th Cir. 1990) (citations omitted).

In their motion, Defendants do not specifically address any of the five elements of a tortious interference with business relations claim. Rather, they contend that Athena has failed to allege any "wrongful" conduct by Wilkes because he, in fact, is the rightful owner of the PEX. Defs.' Mot. at 14. As discussed above, however, the Court disagrees with Defendants' interpretation of the November 14, 2008 Agreement insofar as they contend that it establishes Wilkes' ownership of all rights to the PEX. The Court also is not persuaded by Defendants' ancillary assertion that the FAC lacks allegations of intentional interference by Wilkes. Among other things, the pleadings allege that Wilkes defied Athena's cease and desist letter and "caused . . . King Champion to threaten to cease manufacture of Athena's product." FAC ¶ 25. In addition, Athena alleges that both Wilkes and Cordell caused King Champion to cease or delay production of Athena's Spirit product while, at the same time, producing the PEX for Wilkes. Id. ¶ 31. Athena alleges that the

1  delayed shipments and product shortages were "devastating." Id. These and other
2  allegations of the FAC are sufficient to provide Defendants with "fair notice of what the …
3  claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555. Defendants'
4  motion to dismiss Athena's sixth claim, therefore, is DENIED.

### 7. Unfair Competition

6  The UCL makes actionable any "unlawful, unfair or fraudulent business act or
7  practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is a separate and
8  distinct theory of liability." Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009).
9  Different legal standards and pleading requirements apply to each prong. See Zero
10 Motorcycles, Inc. v. Pirelli Tyre S.p.A., -- F. Supp. 2d --, 2011 WL 2844397, at *4-*6
11 (N.D. Cal. July 18, 2011) (discussing different requirements applicable to UCL claims)
12 (Armstrong, J.). For example, a claim brought under the fraudulent prong of the UCL must
13 be pled with particularity under Rule 9(b), while the other prongs do not. Id. Here, Athena
14 fails to allege which prong or prongs of the UCL forms the basis of its claim. Rather,
15 Athena merely alleges, in an entirely conclusory manner, that Defendants' actions have
16 interfered with its ability to sell the Spirit and negatively impacted Athena's sales. FAC ¶
17 83. Such allegations are precisely the type of fact-barren, conclusory pleading that the
18 Supreme Court has held is insufficient under Rule 8. Iqbal, 129 S.Ct. at 1949. Thus, the
19 Court GRANTS Defendants' motion to dismiss Athena's seventh claim, with leave to
20 amend.

### 8. Liability of Cordell

22 Finally, Defendants contend that there is no basis upon which to hold Cordell
23 individually liable because the pleadings allege that he was acting at all time as the agent
24 for Silk Road. Defs.' Mot. at 16. Generally, "[d]irectors or officers of a corporation do not
25 incur personal liability for torts of the corporation merely by reason of their official
26 position, unless they participate in the wrong or authorize or direct that it be done." United
27 States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 595 (1970). The statutory
28 scheme governing limited liability companies provides for a comparable exclusion of

1  personal liability for members and managers of a California limited liability company. Cal.
2  Corp. Code § 17101(a). This section provides, in relevant part, that "no member of a
3  limited liability company shall be personally liable . . . for any . . . liability of the limited
4  liability company, whether that liability . . . arises in contract, tort, or otherwise, solely by
5  reasons of being a member of the limited liability company ." Id.; see also Cal. Corp. Code
6  § 17158(a) ("No person who is a manager or officer or both . . . of a limited liability
7  company shall be personally liable . . . for any . . . liability of the limited liability company,
8  whether that liability . . . arises in contract, tort, or otherwise, solely by reason of being a
9  manager or officer or both ... of the limited liability company").

10       The above notwithstanding, "[w]hile generally members of a limited liability
11 company are not personally liable for judgments, debts, obligations, or liabilities of the
12 company 'solely by reason of being a member', . . . they are subject to liability under the
13 same circumstances and to the same extent as corporate shareholders under common law
14 principles governing alter ego liability and are personally liable under the same
15 circumstances and extent as corporate shareholders." People v. Pacific Landmark, LLC,
16 129 Cal.App.4th 1203, 1212 (2005). As such, "whereas managers of limited liability
17 companies may not be held liable for the wrongful conduct of the companies merely
18 because of the managers' status, they may nonetheless be held accountable under
19 Corporations Code section 17158, subdivision (a) for their personal participation in tortious
20 or criminal conduct, even when performing their duties as manager." Id. at 1213.

21       Cordell is named individually as a Defendant in Athena's second claim for inducing
22 patent infringement, third claim for misappropriation of trade secrets, fifth claim for
23 inducing breach of contract, sixth claim for interference with business relations and seventh
24 claim for unfair competition. According to Defendants, Cordell should be dismissed from
25 each of these claims, since Athena's dealings with Cordell were always in his capacity as
26 an agent for Silk Road, and not as an individual. This contention lacks merit. While it is
27 true that the FAC alleges that Cordell signed Athena's Confidentiality Agreement on behalf
28 of Silk Road, the pleadings also attribute conduct to Cordell individually, without reference

to Silk Road. E.g., FAC ¶¶ 25, 26, 57, 64, 74, 78. Accordingly, the Court is not persuaded that Cordell should be dismissed from the FAC.

## III. MOTION TO COMPEL ARBITRATION AND TO STAY

Defendants Cordell and Silk Road have separately filed a motion to compel arbitration and to stay the proceedings during the pendency of such arbitration. Dkt. 41. Since Athena has alleged viable claims against these Defendants, the Court now considers whether such claims are subject to the arbitration clause contained in the Distributor Agreement.[4]

### A. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), any party bound by an arbitration agreement that falls within the scope of the FAA may bring a petition in federal district court to compel arbitration. 9 U.S.C. § 4. When faced with a petition to compel arbitration, the district court's role is a discrete and narrow one. "By its terms, the [FAA] 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985)).

"The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. … If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." Id. "To require arbitration, [plaintiff]'s factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999). Where a

---

[4] The arbitration clause is contained in the Distributor Agreement, which is an agreement expressly between Athena and Silk Road. Cordell Decl. Ex. B. Therefore, the only claims that are potentially subject to the arbitration clause are those alleged against Silk Road, not Cordell.

- 16 -

1 district court determines that a dispute is subject to arbitration under a written agreement,
2 the court "shall on application of one of the parties stay the trial of the action until such
3 arbitration has been had in accordance with the terms of the agreement, providing the
4 applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.
5 Thus, the FAA "requires that the court stay judicial proceedings until the matter has been
6 arbitrated according to the terms of the arbitration agreement." Leicht v. Bateman Eichler,
7 Hill Richards, Inc., 848 F.2d 130, 133 (9th Cir. 1988).

8     In analyzing whether parties are contractually bound to arbitrate their dispute, the
9 Court applies state-law principles governing the formation of contracts. Comedy Club, 553
10 F.3d at 1285 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). As
11 discussed, the parties' intent is to be gleaned "from the writing alone, if possible." Id.
12 (quoting Cal. Civ. Code § 1639)). "However, '[i]f a contract is capable of two different
13 reasonable interpretations, the contract is ambiguous,'…. and under the federal
14 presumption in favor of arbitration, an arbitrator would have jurisdiction to arbitrate
15 claims." Comedy Club, 553 F.3d at 1285 (citing AT & T Techs., Inc. v. Commc'ns
16 Workers of Am., 475 U.S. 643, 650 (1986)).

17     **B.**    **ANALYSIS**

18     There is no dispute as to the first requirement for compelling arbitration; i.e., that a
19 valid arbitration agreement exists. Therefore, the salient question is whether the arbitration
20 clause contained in the Distributor Agreement encompasses the claims alleged in the
21 Complaint. The arbitration clause at issue specifies that, "*All* disputes will be submitted to
22 binding arbitration." Cordell Decl. Ex. B ¶ 14 (emphasis added). Athena contends that
23 "[a]ll disputes" refers only to those disputes relating the Distributor Agreement, and that its
24 claims arise from the Confidentiality Agreement, which does not contain an arbitration
25 clause. Further, Athena points out that the Distributor Agreement neither incorporates by
26 reference nor makes any mention of the Confidentiality Agreement upon which the claims
27 alleged in its First Amended Complaint ostensibly are predicated.
28

Athena's contention that this provision is limited to disputes specifically relating to the Distributor Agreement would be plausible if the arbitration clause had specified that the disputes subject to arbitration only included those "arising from" or "relating to" the Distributor Agreement. Comedy Club, 553 F.3d at 1285. However, the arbitration clause contains no such limitation, and the Court is not at liberty to insert terms into an agreement. See Vons Cos., Inc. v. U.S. Fire Ins. Co., 78 Cal.App.4th 52, 59 (2000) ("We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there."). In addition, Athena's construction is not the *only* reasonable interpretation of such clause. As Defendants point out, the arbitration clause expressly states that "[a]ll disputes" between the parties are subject to arbitration. Since this clause is not circumscribed in any manner, it is reasonable to construe the clause as requiring the parties to submit all disputes between them to an arbitrator. Thus, to the extent that "[a]ll disputes" is "capable of two different reasonable interpretations," such ambiguity must be resolved in favor of compelling arbitration. Comedy Club, 553 F.3d at 1286.

Moreover, even if Athena were correct in its assertion that the arbitration clause applies only to disputes arising from the Distributor Agreement, enforcement of the arbitration clause is still proper. Claims arising from one agreement may be subject to an arbitration agreement contained in another agreement. Simula, 175 F.3d at 721. "To require arbitration, [a party's] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." Id. Here, Athena alleges that Silk Road used its business relationship with Athena to assist Wilkes in engaging in actions that resulted in the alleged infringement of Athena's patent. FAC ¶¶ 16-33, 57. That relationship commenced with the Confidentiality Agreement, which was executed on June 26, 2011, the same date that Cordell began selling the PMT in the United Kingdom and abroad. FAC ¶¶ 16, 20. Although the Distribution Agreement memorializing their distribution arrangement was not executed until a month later on July 17, 2006, it is readily apparent that such agreement is intertwined with the

parties' business relationship, which was formed upon execution of the Confidentiality Agreement. The Court thus concludes that Athena's claims against Silk Road must be arbitrated.

## IV. CONCLUSION

Having now resolved the threshold issues relating to the pleadings and the applicability of the arbitration clause, the Court finds that it is in the parties' best interests to attempt to reach a resolution of this matter before expending additional time and resources towards litigating this matter. To facilitate the settlement process, the Court will refer the instant action for a mandatory settlement conference. Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Defendants' Motion to Dismiss Plaintiff's First Amended Complaint is GRANTED IN PART and DENIED IN PART, as follows:

    a.      Defendants' motion to dismiss Plaintiff's first claim for direct patent infringement is DENIED.

    b.      Defendants' motion to dismiss Plaintiff's second claim for inducing patent infringement is DENIED.

    c.      Defendants' motion to dismiss Plaintiff's third claim for misappropriation of trade secrets is GRANTED as to Cordell and Silk Road, with leave to amend, and is DENIED as to all other Defendants.

    d.      Defendants' motion to dismiss Plaintiff's fourth claim for breach of contract is DENIED.

    e.      Defendants' motion to dismiss Plaintiff's fifth claim for inducing breach of contract is GRANTED, with leave to amend.

    f.      Defendants' motion to dismiss Plaintiff's sixth claim for intentional interference with business relations is DENIED.

    g.      Defendants' motion to dismiss Plaintiff's seventh claim for unfair competition is GRANTED, with leave to amend.

2. Defendants Cordell and Silk Road's motion to compel arbitration and to stay proceedings is GRANTED as to Silk Road and DENIED as to Cordell. Plaintiff's claims against Silk Road are stayed pending conclusion of the arbitration proceeding.

3. Plaintiff shall have fourteen (14) days from the date this Order is filed to file a Second Amended Complaint, consistent with the Court's rulings. Plaintiff is advised that any additional factual allegations set forth in its Second Amended Complaint must be made in good faith and consistent with Rule 11. Failure to file a Second Amended Complaint by that deadline will result in the dismissal with prejudice of the dismissed claims.

4. The instant action is REFERRED to **Magistrate Judge Donna Ryu** for a mandatory settlement conference to take place within sixty (60) days of the date this order is filed. In the event the action does not resolve at the settlement conference, the arbitration regarding Plaintiff's claim against Silk Road shall be completed within sixty (60) days after the Magistrate Judge Ryu concludes her settlement conference.

5. The parties shall appear for a telephonic Case Management Conference on **November 16, 2011 at 2:30 p.m.** Prior to the date scheduled for the conference, the parties shall meet and confer and prepare a joint Case Management Conference Statement. Plaintiff is responsible for filing joint statement no less than seven (7) days prior to the conference date. The joint statement shall comply with the Standing Order for All Judges of the Northern District of California and the Standing Orders of this Court. Plaintiff is responsible for setting up the conference call. On the specified date and time, Plaintiff shall call (510) 637-3559 with all parties on the line.

6. This Order terminates Docket 41 and 43.

IT IS SO ORDERED.

Dated: September 12, 2011

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge

- 20 -